UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANTHONY SETTIMO BARBUTO and
PATRICIA ANN MCCARTHY,
Legal Guardian for Anthony Settimo Barbuto,

        Plaintiffs,

    v.                                  Case No. 22-C-569

DANIEL HARTWIG, et al.,

        Defendants.

## SCREENING ORDER

    Non-attorney Patricia Ann McCarthy filed this action as guardian for and on behalf of Anthony Barbuto, who is legally incompetent, for alleged violations of Barbuto's civil rights while he was an inmate at the Manitowoc County Jail. The case is before the Court on Barbuto's motion for leave to proceed without prepaying the full filing fee. Dkt. Nos. 1-2. For the reasons set forth below, the motion will be granted and the case will proceed.

### MOTION TO PROCEED WITHOUT PREPAYMENT OF THE FILING FEE

    Barbuto has requested leave to proceed without prepayment of the filing fee (*in forma pauperis*). Dkt. No. 2. According to his supporting declaration, Barbuto is disabled but works at a sheltered workshop, earning approximately $100 per month. He also receives approximately $763 per month in SSI benefits. From these amounts, he pays his rent and other household expenses. The Court concludes that Barbuto lacks sufficient income and assets to pay the filing fee. Accordingly, the Court will grant Barbuto's motion for leave to proceed without prepaying the full filing fee. Because Barbuto was no longer a prisoner at the time the complaint was filed, the case is not governed by the Prison Litigation Reform Act, 28 U.S.C. § 1915(a)(2). As a result,

Barbuto need not file a copy of his jail trust fund account and is not required to pay the full filing fee over time.

## SCREENING OF THE COMPLAINT

"[D]istrict courts have the power to screen complaints filed by all litigants, prisoners and non-prisoners alike, regardless of fee status." *Rowe v. Shake*, 196 F.3d 778, 783 (7th Cir. 1999). In screening a complaint, the Court must determine whether the complaint complies with the Federal Rules of Civil Procedure and states at least plausible claims for which relief may be granted. To state a cognizable claim under the federal notice pleading system, the plaintiff is required to provide a "short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). It must be at least sufficient to provide notice to each defendant of what he or she is accused of doing, as well as when and where the alleged actions or inactions occurred, and the nature and extent of any damage or injury the actions or inactions caused.

"The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 556. "[T]he complaint's allegations must be enough to raise a right to relief above the speculative level." *Id*. at 555 (internal quotations omitted).

2

### ALLEGATIONS OF THE COMPLAINT

At the relevant time, Barbuto was incarcerated at the Manitowoc County Jail (MCJ). Dkt. No. 1. Defendant Daniel Hartwig was sheriff of Manitowoc County; Joy L. Brixius was a lieutenant at MCJ; Dr. Karen Ronquillo-Horton was a doctor at MCJ; Kevin Mueller was an individual who worked for the Department of Corrections (DOC) in Manitowoc County; and Elizabeth Rekowski was a DOC parole agent in Manitowoc County. *Id*. at 2-4.

Barbuto is a legally incompetent individual who is diagnosed with autism, bipolar disorder, anxiety disorder, mental health issues, liver disease, gout, and most recently "C-Diff," a contagious infection of the large intestine that causes colon issues. *Id*. at 7-8. In August 2018, Barbuto attempted suicide and was "nearly successful." *Id*. at 37-38. It's unclear where this suicide attempt occurred because the complaint mentions prior incarcerations at the Washington County Jail and MCJ, *see id*. at 33-38, but Barbuto believes that staff members at both jails are generally aware of his unique and extensive health issues that make managing his incarceration very difficult. *Id*. In January 2019, Barbuto engaged in another act of self-harm, *id*. at 37, but again the details of this incident are unclear. *Id*.

Barbuto arrived at MCJ on May 29, 2019. *Id*. at 12. At that time, Barbuto's legal guardian spoke with Sheriff Hartwig and Lieutenant Brixius to discuss Barbuto's medical issues and to notify them that he was currently diagnosed with C-Diff, a contagious infection. *Id.* at 12, 17. The legal guardian provided a bottle of Vancomycin that was prescribed for the C-Diff infection. *Id*. at 12. Rather than giving Barbuto the prescribed medication, Dr. Ronquillo-Horton withheld the medication because Barbuto's C-Diff infection allegedly "could not be detect[ed] in the odor of the stool." *Id*. at 12-13. When the legal guardian questioned this reasoning, Sheriff Hartwig reiterated that a C-Diff infection could allegedly be detected in the "odor" of stool without other

medical evaluation, and because there was no odor, he could not have the medication. *Id*. Barbuto did not get any treatment for his C-Diff infection at that time. *Id*.

A few days later, on June 1, 2019, Barbuto was committed to the Winnebago Mental Health Institute after attempting to self-harm. *Id*. at 14. Barbuto does not provide many details about the self-harm incident (i.e. whether he told anyone that he was feeling suicidal and what those individuals said or did in response), but his self-harm attempt was serious enough that Barbuto was immediately committed to a mental health institute. *Id*. Dr. Ronquillo-Horton did not notify staff at the Winnebago Mental Health Institute that Barbuto was diagnosed with a C-Diff infection, so no one at the mental health institute gave him the Vancomycin prescription either. *Id*. at 27.

About two weeks later, on June 12, 2019, Barbuto was released from the Winnebago Mental Health Institute and returned to the jail. *Id*. at 14. On June 14, 2019, Barbuto tried to hang himself and was immediately placed in solitary confinement at the jail. *Id*. Despite the change in Barbuto's mental health, Barbuto did not receive any mental health care at the jail following his attempt to hang himself. *Id*. at 32. When the legal guardian questioned this decision, she was told that the Winnebago Mental Health Institute had recently concluded that he was "ok to be in jail." *Id*. at 15, 32.

While in solitary confinement, Barbuto's C-Diff infection was not being treated, so he had extreme diarrhea and dehydration. *Id*. at 26. But Barbuto could not purchase extra fluids from the canteen (such as clear sodas and juices), and he was limited to water from the faucet. *Id*. at 18-19. Barbuto's legal guardian asked Sheriff Hartwig for a medical exception to provide Barbuto with more fluids while in solitary, but Hartwig responded that a cup and faucet were adequate for hydration. *Id*. at 19. Meanwhile, Barbuto continued to take a strong lithium medication for his other medical issues. *Id*. at 18-19.

4

On June 21, 2019, three weeks after arriving at MCJ, Dr. Ronquillo-Horton decided to properly evaluate Barbuto's C-Diff infection. *Id*. at 27. Rather than give Barbuto the Vancomycin that had already been prescribed (and already in her possession), however, Dr. Ronquillo-Horton ordered an ineffective antibiotic that exacerbated Barbuto's diarrhea and caused extreme dehydration. *Id*. at 27-28. Barbuto later reported that he believed he had lithium toxicity from taking his lithium medication while dehydrated. *Id*. at 28-29. He explains he was dizzy and confused. *Id*. at 19. These symptoms were ignored for the next three days.

On June 24, 2019, Barbuto was sent to Holy Family Hospital for lab work. *Id*. at 28. The lab results showed toxic levels of lithium that were four times the normal amount. *Id*. at 8, 22, 29. Barbuto explains that a lithium level of 1.2 requires an I.V., and his level of 4.4 required immediate dialysis. *Id*. at 10, 22. Instead of being immediately taken to a local hospital, however, Barbuto remained at the jail. *Id*. Dr. Ronquillo-Horton ordered Gatorade and reported that Barbuto "could refuse the lithium" if he believed he had lithium toxicity. *Id*. at 9, 29-30. Barbuto notes that he is legally incompetent, so he could not easily reject medication. *Id*. The lithium toxicity made him dizzy and confused so he could not get up to get more water from the faucet, making him more dehydrated. *Id*. at 19.

Three days later, on June 27, 2019, a nurse from an outside clinic called the jail and instructed medical staff to immediately take Barbuto to the emergency room due to lithium toxicity. *Id*. at 22. Dr. Ronquillo-Horton ignored the recommendation and, with the help of Brixius, turned away the ambulance that was sent that day. *Id*. Barbuto had increased tremors, was confused, and was unable to take food or fluid. *Id*. at 31. Barbuto states that there is video of staff members "dragging [him] from one cell to another without a stretcher or gurney . . . [and] dragg[ing] [him] across the floor like a deer carcass with urine leaking from the adult diapers he uses to control incontinence." *Id*. at 15.

5

On June 28, 2019, Barbuto was taken to a local hospital. *Id*. at 10, 31. The local hospital immediately transferred him to St. Vincent Hospital in Green Bay because he needed 24-hour dialysis, which was not available at the original hospital. *Id*. Barbuto remained in the intensive care unit at the hospital receiving 24-hour dialysis until July 3, 2019. *Id*. at 11, 32. Barbuto was told that he could have died from the lithium toxicity. *Id*. at 10. Barbuto has had a long recovery period following release from the hospital. He alleges he has had difficulty speaking, difficulty moving, difficulty remembering things, and mental distress. *Id*. at 33.

While these incidents occurred, Barbuto's legal guardian was zealously attempting to communicate with jail staff regarding Barbuto's medical care. *See id*. at 9-34. Brixius, in consultation with Hartwig and Dr. Ronquillo-Horton, stymied her at every opportunity. *See id*. at 20-24. In addition to withholding information about Barbuto's attempt to hang himself and his toxic lab results, Brixius took active measures to prevent information from getting to the legal guardian and Barbuto's outside medical providers. *Id*. at 16, 20-24. Brixius "blacked out" notes in Barbuto's jail and medical file from June 14, June 18, and June 25; she sent an email to her subordinates instructing them to "not share anything about what [Barbuto] is doing or his behavior;" and on June 18 she told the legal guardian "not to call so often." *Id*. at 20-24.

Barbuto explains that Mueller and Rekowski were also aware of his unique and extensive medical issues, including the C-Diff infection. *Id*. at 34-44. Prior to Barbuto's incarceration at MCJ, the legal guardian gave Mueller a letter from a psychiatrist stating that "further incarceration would be harmful for [Barbuto] and that they should seek other options." *Id*. at 34-35. Barbuto's criminal defense attorney then provided a lengthy written outline of other forms of incarceration that would "have an appropriate consequence legally while still meeting his medical needs." *Id*. at 36-37. Barbuto's criminal defense attorney even contacted DOC headquarters in Madison and

6

got approval that the alternative forms of incarceration noted in the outline were "acceptable." *Id*. at 38-39.

On the morning of May 29, 2019, Barbuto's legal guardian discussed the psychiatrist's letter, along with the alternatives outlined, with both Mueller and Rekowski, but they decided to send Barbuto to MCJ anyway without any plan in place to handle his extensive medical and mental health issues. *Id*. at 35-37. Rekowski apparently emailed Brixius to tell her that Barbuto had a host of medical and mental health needs, and Brixius sent an email back "expressing concerns about being able to meet [Barbuto's] needs" at the jail. *Id*. at 23, 41. Barbuto was sent to MCJ with no plan in place to handle his extensive medical needs. *Id*. at 34-44.

Rekowski, like Brixius, told Barbuto's legal guardian that neither she nor his criminal defense attorney were welcome to attend parole meetings with Barbuto. *Id*. at 41-42. She maintained her position even after a DOC official wrote to her indicating that the legal guardian was legally required to attend meetings and receive information about Barbuto. *Id*. at 43-44. Barbuto cites at least one meeting at the Rodger's Memorial Hospital that he had with Rekowski without his legal guardian or criminal defense attorney, even after Rekowski was notified that a legal guardian was required to be present. *Id*. at 43-44. Barbuto seeks monetary damages and injunctive relief. *Id*. at 45.

### THE COURT'S ANALYSIS

"To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that he or she was deprived of a right secured by the Constitution or the laws of the United States, and that this deprivation occurred at the hands of a person or persons acting under the color of state law." *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015) (citing *Buchanan–Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)).

Barbuto seeks to proceed with an Eighth Amendment deliberate indifference claim against all defendants. Dkt. No. 1 at 5-6. To state an Eighth Amendment deliberate indifference claim, Barbuto must allege (1) that he suffered from an objectively serious medical condition and (2) that the defendants were subjectively deliberately indifferent to that condition. *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). A plaintiff must allege "that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). The plaintiff must allege that the prison official's choices "were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment." *Stallings v. Liping Zhang*, 607 F. App'x 591, 593 (7th Cir. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)).

Barbuto alleges that he has autism, bipolar disorder, anxiety disorder, mental health issues, liver disease, gout, and C-Diff. These satisfy the requirement of an "objectively" serious medical condition. *See Sanville v. McCaughtry*, 266 F.3d 724, 728 (7th Cir. 2001) (characterizing an inmate with a depressive order, bipolar disorder, and manic depression as someone with serious mental health problems); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 832 (7th Cir. 2009) (concluding that "contagious infection[s]" are a serious medical need); s*ee also Wachter v. Meyers*, No. 3:22-CV-00577-SMY, 2022 WL 889084, at *2 (S.D. Ill. Mar. 25, 2022) (noting that autism and the side effects from autism medication is a serious medical condition).

Barbuto also alleges that Defendants were deliberately indifferent towards his medical conditions. With respect to Hartwig, Brixius, and Ronquillo-Horton, Barbuto alleges that they knew about his serious medical conditions because his legal guardian contacted them numerous times while he was incarcerated to make sure he was getting proper medical care. Barbuto alleges that Hartwig, Brixius, and Ronquillo-Horton not only ignored/refused to provide proper treatment for his contagious C-Diff infection, lithium toxicity, and mental health issues, but they worked

8

together to hide their inaction by "blacking-out" jail and medical records, refusing to communicate with outside medical care providers, and directing Barbuto's legal guardian to contact them less. As a result of their conduct, Barbuto experienced lithium toxicity and was in the intensive care unit for a number of days. Of course, these are only allegations at this point, but based on these allegations Barbuto will be permitted to proceed on a deliberate indifference claim against Hartwig, Brixius, and Ronquillo-Horton.

Barbuto also alleges that Mueller and Rekowski knew about his serious medical conditions because they had a meeting with his legal guardian to discuss managing his unique and extensive medical issues prior to his arrival at MCJ. Although neither Mueller nor Rekowski worked at the jail or appear to have been contacted while Barbuto struggled with his medical conditions at MCJ, their decision to send Barbuto to MCJ, knowing that the jail did not have the infrastructure and resources in place to handle his unique and extensive medical care issues, is enough to state an Eighth Amendment deliberate indifference claim against them at this point in the litigation. Indeed, Barbuto alleges that Mueller and Rekowski were both presented with DOC "approved" alternative forms of incarceration that could have handled his serious medical needs while still punishing him for his crimes, but they sent him to MCJ knowing that the jail almost certainly could not meet his needs and without a plan in place to do so. Based on these allegations, Barbuto will be permitted to proceed on a deliberate indifference claim against Mueller and Rekowski.

## Conclusion

The Court finds that Barbuto may proceed with an Eighth Amendment denial of medical care claim and denial mental health care claim against Hartwig, Brixius, Ronquillo-Horton, Mueller, and Rekowski regarding his C-Diff infection, attempted suicide, and lithium toxicity at the Manitowoc County Jail in May 2019 and June 2019.

**IT IS THEREFORE ORDERED** that Barbuto's non-prisoner motion for leave to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED**. Given the seriousness of the allegations, Ms. McCarthy is strongly encouraged to seek counsel for her ward.

**IT IS FURTHER ORDERED** that the United States Marshal shall serve a copy of the complaint and this order upon Hartwig, Brixius, Ronquillo-Horton, Mueller, and Rekowski pursuant to Federal Rule of Civil Procedure 4. Barbuto is advised that Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. § 1921(a). The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§ 0.114(a)(2)–(3). Although Congress requires the Court to order service by the U.S. Marshals Service precisely because *in forma pauperis* plaintiffs are indigent, it has not made any provision for these fees to be waived either by the Court or by the U.S. Marshals Service. The Court is not involved in the collection of the fee.

**IT IS FURTHER ORDERED** that Hartwig, Brixius, Ronquillo-Horton, Mueller, and Rekowski shall file a responsive pleading to the complaint.

**IT IS FURTHER ORDERED** that copies of the complaint and this order be sent to the administrator of the Manitowoc County Jail, as well as to the Manitowoc County Sheriff, and the Manitowoc County Corporation Counsel.

**IT IS FURTHER ORDERED** that the parties may not begin discovery until after the Court enters a scheduling order setting deadlines for discovery and dispositive motions.

**IT IS FURTHER ORDERED** that plaintiffs who are inmates at Prisoner E-Filing Program institutions must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the Court. The Prisoner E-Filing Program is mandatory for all inmates of Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution,

and Oshkosh Correctional Institution. All other plaintiffs must submit the original document for each filing to the Court to the following address:

>    Honorable William C. Griesbach
>    c/o Office of the Clerk
>    United States District Court
>    Eastern District of Wisconsin
>    125 S. Jefferson Street, Suite 102
>    Green Bay, WI 54301

PLEASE DO NOT MAIL ANYTHING DIRECTLY TO THE COURT'S CHAMBERS. It will only delay the processing of the matter.

Barbuto is further advised that failure to make a timely submission may result in the dismissal of this action for failure to prosecute.

In addition, the parties must notify the Clerk of Court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties. Therefore, failure to provide your correct address could result in dismissal of your case for failure to prosecute.

Enclosed is a guide prepared by court staff to address common questions that arise in cases filed by prisoners. Entitled "Answers to Prisoner Litigants' Common Questions," this guide contains information that Barbuto may find useful in prosecuting this case.

Dated at Green Bay, Wisconsin this <u>8th</u> day of July, 2022.

>    s/ William C. Griesbach
>    William C. Griesbach
>    United States District Judge