UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANTHONY SETTIMO BARBUTO, et al.,

    Plaintiffs,

    v.                                          Case No. 22-C-569

DR. KAREN RONQUILLO-HORTON,

    Defendant.

## DECISION AND ORDER

Plaintiffs Anthony Barbuto and his legal guardian, Patricia McCarthy, filed a pro se complaint on May 13, 2022, alleging that Defendant Karen Ronquillo-Horton, and others associated with the Manitowoc County Jail violated his constitutional rights, along with various state laws, by denying Barbuto proper medical care at the Manitowoc County Jail in June 2019. Dkt. No. 26. They have since retained counsel and an amended complaint was filed. On June 13, 2024, Defendant filed a motion for partial summary judgment in connection with the federal claim. Dkt. No. 106. Other defendants have apparently settled and are no longer parties. Much of this decision addresses the uncertainty over what standard should be applied to Plaintiffs' claim, deliberate indifference or objective reasonableness. But because there are genuine disputes of material fact from which a reasonable jury could find in Plaintiffs' favor under either standard, the Court will deny the motion for partial summary judgment.

## FACTS

At the relevant time, Barbuto was a legally incompetent inmate on a probation hold at the Manitowoc County Jail. Dkt. No. 119, ¶21. Defendant Ronquillo-Horton was the primary physician at the jail, contracted by Manitowoc County through Advanced Correctional Healthcare

(ACH). Dkt. No. 113, ¶29. Dr. Ronquillo-Horton's job duties included doing rounds at the jail once per week; reviewing medical records prepared by the jail's three nurses; seeing patients who were assigned for sick call or follow-ups; and taking calls while off-site in connection with medications, sick calls, or other medical concerns. *Id*., ¶¶ 16 & 26. Dr. Ronquillo-Horton spent roughly 2-3 hours per week at the jail during her weekly visits depending on how much work she needed to do at the jail. *Id*., ¶31. The remainder of the hours in her work week were spent as the primary physician in the jails in Racine County, Jefferson County, Sauk County, Fond du Lac County, Sheboygan County, Calumet County, Marinette County, Green County, and Oneida County. *Id*., ¶¶25, 29, & 31.

On June 12, 2019, Barbuto returned to the jail from a 72-hour emergency detention at the Winnebago Mental Health Institute for attempting to self-harm. *Id*., ¶33. At that time, Dr. Ronquillo-Horton was not at the jail, but she reviewed his discharge summary, which noted a prescription for lithium (a mood stabilizer) to reduce urges of self-harm. *Id*., ¶¶33-36. She ordered that the prescription continue at the jail. *Id*., ¶33. Two days later, on June 14, 2024, Barbuto began displaying strange and concerning behavior—he was found with a T-shirt tied around his neck, smearing and eating his own feces, and had blood all over his hands. He reported he had placed his scrotum on the ground with an intention of harming himself. Dkt. No. 111-1 at 5.

The following week, when Dr. Ronquillo-Horton was at the jail on June 19, 2019, she performed a physical evaluation of Barbuto, including assessing his scrotum. Dkt. No. 113, ¶¶45-47; *see also* Dkt. No. 111-1 at 6. She also ordered labs and a lithium levels test. Dkt. No. 113, ¶47. Dr. Ronquillo-Horton explains that she ordered the lithium levels test because she wanted a "baseline" for Barbuto and his medical records from Winnebago did not contain them. *Id*., ¶48. Dr. Ronquillo-Horton states that Barbuto was not presenting with any signs or symptoms of lithium

2

toxicity on that day, and she had no concerns about lithium levels when she ordered the test, *id.*, ¶¶48 & 49, though confusion and delirium are symptoms of lithium toxicity, *see* Dkt. No. 111-1 at 3. Dr. Ronquillo-Horton also prescribed 50 milligrams of indomethacin (a nonsteroidal anti-inflammatory drug (NSAID)) twice a day for five days to treat his gout symptoms. Dkt. No. 113, ¶¶42 & 46. Barbuto is allergic to NSAIDs, though the parties agree that the allergy was not reflected in his medical records, and Dr. Ronquillo-Horton did not know about the allergy when she prescribed the medication. Dkt. No. 118, ¶¶37-46. Indomethacin can also increase lithium levels by 10-25% in some patients, and up to 100% in other patients, so patients must be closely monitored if on both medications at the same time. Dkt. No. 111-1 at 3. Barbuto took indomethacin from June 21, 2019 to June 26, 2019. *Id*. at 6. During that time period, Barbuto reported vomiting at least once per day, an upset stomach, difficulty eating, feeling "shaky," having difficulty using the phone to call staff due to hand tremors, and concern that his lithium levels were too high based on past experiences with lithium toxicity. *Id*. These concerns were noted in his medical file. Dkt. No. 113, ¶¶54-55.

Dr. Ronquillo-Horton returned to the jail again on June 25, 2019. *Id*., ¶53. At that time, Nurse Schuette (not a defendant) informed her that the lithium levels test she had ordered the prior week still had not been completed. *Id*., ¶59. Dr. Ronquillo-Horton ordered that the lithium labs test be completed right away. *Id*., ¶¶60-62. She also reviewed Barbuto's medical file. *Id*., ¶¶54-55. She states that she was not concerned about the upset stomach/vomiting and bilateral hand tremors/shakiness at the time because Barbuto was being treated for C. Diff, which causes GI symptoms, and he also had a prescription for perphenazine, which can cause tremors. *Id*., ¶¶ 56 & 63. Barbuto also had a "baseline" for bilateral hand tremors that dated back to 2016; and tremors

related to lithium toxicity generally involve the entire upper and lower extremities (not just the hands). *Id*., ¶¶57-58.

The primary issue in this case involves what happened on June 27, 2019 and the following days. *Id*., ¶¶ 64–88. On June 27, 2019, at around 8:45 a.m., Nurse Schuette called Dr. Ronquillo-Horton regarding Barbuto's lithium level results from Froedtert Holy Family Memorial Hospital. *Id*., ¶64. Nurse Schuette reported that his lithium levels were at a 4.3 mmol/L, but he otherwise had normal vitals. *Id*., ¶¶65-66. Given his normal vitals, Dr. Ronquillo-Horton ordered that the lithium medication be discontinued for two days, with repeat lithium testing after two days. *Id*., ¶¶ 14, 66, & 67. She explains that one elevated lithium test result, without other "clinical findings" of lithium toxicity, would not be enough to send a patient to the ER and she wanted a re-test to avoid potential error. *Id*., ¶¶74, 75, & 85. Dr. Ronquillo-Horton directed nursing staff to report back the following morning, after the last dose of lithium left his system—approximately 8-12 hours. *Id*., ¶¶ 71, 84, & 85. She also ordered a complete metabolic panel, Zofran to help with nausea, and Gatorade to help with dehydration. *Id*., ¶¶17, 69, & 72. Dr. Ronquillo-Horton did not order nursing staff to call 911 or take Barbuto to the ER immediately because she did not believe he was presenting with signs of lithium toxicity. *Id*., ¶¶15, 68, & 73.

The following morning, on June 28, 2019 at around 6:55 a.m., Nurse Schuette called Dr. Ronquillo-Horton and told her that Barbuto's condition had changed. *Id*., ¶¶78 & 82. Barbuto was walking around his cell block naked, was struggling to find words to answer questions, had unsteady steps, had fecal matter in his fingernails, had bilateral hand tremors, and complained of nausea. *Id*., ¶78. Following this report, Dr. Ronquillo-Horton gave the order for Barbuto to be sent to the ER, a process nursing staff had already started before calling Dr. Ronquillo-Horton. *Id*., ¶¶20, 79, 80, & 83. Once at the ER, doctors diagnosed Barbuto with kidney failure,

4

hypercalcemia, altered mental status, and drug poisoning; and they immediately transported him to another hospital's ICU, where he was placed on hemodialysis for multiple days. Dkt. No. 111-1 at 8. Hemodialysis is the process of using a machine to filter waste and water from a patient's body, after the kidneys have failed. *Id*. at 3.

Plaintiff retained Dr. Jacquline Landess, a board-certified forensic psychiatrist, to evaluate the treatment or lack thereof that Barbuto received at the Manitowoc County Jail. Dr. Landess explains that lithium has a very narrow therapeutic index, meaning too much lithium in an individual's body can be toxic. *Id*. at 2. A lithium range between 0.5 mmol/L and 1.2 mmol/L is considered normal; and a level above 2 mmol/L can cause toxicity. *Id*. A level of 4.3 mmol/L is "severely moderate to severe toxic" range and warrants "immediate intervention." *Id*. at 13. Early symptoms of lithium toxicity include nausea, vomiting, tremors, weakness, and fatigue. *Id*. at 3. If left untreated, these symptoms can progress to confusion, agitation, delirium, seizures, coma, hyperthermia, and death. *Id*. In an otherwise healthy patient, a lithium concentration level above 5 requires immediate hemodialysis. *Id*. at 3. In a patient with an impaired kidney, a concentration level above 4 requires immediate hemodialysis. *Id*. And in a patient with altered mental status, a concentration level above 2.5 requires immediate hemodialysis. *Id*. Dr. Landess opines that no doctor using medical judgment would have ordered mere "discontinuation" of lithium, along with Gatorade, for a patient with an altered mental status whose concentration level was at a 4.3 mmol/L. *Id*. Instead, any doctor actually using their medical judgment would have immediately transferred him to the ER for hemodialysis. *Id*. Dr. Landess states that Dr. Ronquillo-Horton's reliance on vital signs (i.e., temperature, pulse, blood pressure, respiration rate, etc.) to assess for lithium toxicity, instead of the neurologic, cognitive, and gastrointestinal symptoms of lithium toxicity (noted above) does not comport with the standard of care. *Id*. at 12. Dr. Landess

5

additionally opines that the indomethacin prescription Dr. Ronquillo-Horton ordered can increase lithium levels by 10-25% in some patients, and up to 100% in other patients, so Barbuto should have been closely monitored immediately upon starting both medications at the same time. *Id*.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The party asserting that a fact is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

### A. The Constitutional Standard

Barbuto was an inmate on a probation hold at the time his constitutional rights were allegedly violated. The question that immediately arises is: Under what standard are Dr. Ronquillo-Horton's actions or failures to act to be judged? In their Amended Complaint, Plaintiffs

6

alleged that Dr. Ronqillo-Horton had violated his Eighth Amendment right against cruel and unusual punishment. The Eighth Amendment applies to persons who have received the full panoply of constitutional safeguards and are serving a sentence for a crime. On the other hand, claims by pretrial detainees, i.e., those who have not been convicted of a crime and are awaiting trial, are governed by the Fourteenth Amendment's Due Process Clause. *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). As an inmate on a probation hold, Barbuto does not fit neatly into either category. As other courts have observed, "[w]hether to classify an individual detained for a suspected probation violation as a pretrial detainee or a convicted prisoner is an unresolved and difficult question." *Hill v. Cty. of Montgomery*, No. 9:14-cv-00933 (BKS/DJS), 2018 WL 2417839, at *2 (N.D.N.Y. May 29, 2018) (quotations omitted) (collecting cases); *see also Ford v. Grand Traverse Cty.*, No. 1:04-cv-682, 2005 WL 2572025, at *1, n.1 (W.D. Mich. Oct. 12, 2005) ("The Eighth Amendment and not the Fourteenth Amendment is the appropriate reference because Plaintiff was imprisoned in connection with a convicted offense (i.e., she was held for a suspected probation violation) and was not a pretrial detainee.").

The Seventh Circuit acknowledged the issue but found it unnecessary to decide it in *Estate of Clark v. Walker*, 865 F.3d 544 (7th Cir. 2017). In affirming the district court's decision denying the defendants' motion for summary judgment, the court noted that while the Eighth Amendment applies to convicted prisoners, and the Fourteenth Amendment applies to pretrial detainees, "[c]ourts have expressed some uncertainty regarding which amendment controls for hybrid forms of detention, such as here where Clark's extended-supervision officer placed him on short 'holds' in the county jail." *Id.* at 546, n.1. Although the district court had analyzed that case under the Eighth Amendment, the Court of Appeals found it unnecessary to address the issue "because of the parties' apparent agreement and because summary judgment was properly denied under the

7

Eighth Amendment standard, which is at least as difficult for a plaintiff to satisfy as the Fourteenth Amendment standard." *Id.* Indeed, under current law, the Eighth Amendment standard is markedly more difficult for a plaintiff to satisfy.

More recently, the Seventh Circuit suggested that an inmate on a probation hold should be considered a pretrial detainee. In *Estate of Wallmow v. Oneida County*, 99 F.4th 385 (7th Cir. 2024), another case involving a claim by the estate of a deceased inmate, the court did not discuss the Eighth Amendment but noted that "[c]laims like these can fall under the Fourth or Fourteenth Amendment, depending on the person's status. 'Before a finding of probable cause, the Fourth Amendment protects an arrestee; after such a finding, the Fourteenth Amendment protects a pretrial detainee.'" *Id.* at 391 (quoting *Pulera v. Sarzant*, 966 F.3d 540, 549 (7th Cir. 2020)). In *Wallmow*, however, the court also found it unnecessary to determine which standard applied, this time because the proposed standards were "interchangeable." *Id.* In light of *Clark* and because *Wallmow* did not even address the Eighth Amendment, it is unclear what the proper standard is for an inmate on a probation hold.

As a result of more recent developments in the law governing treatment of pretrial detainees, the question of which standard applies has taken on added significance. Under the Eighth Amendment, the standard governing claims for failure to provide adequate medical care, or for failure to protect an inmate from threats posed by other inmates, or even the inmate claimant himself, is "deliberate indifference" to serious medical needs or risk of harm. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Until relatively recently, the same standard applied to similar claims by pretrial detainees. *See, e.g., Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010) ("Although the Eighth Amendment applies only to convicted persons, pretrial detainees like Zick are entitled to the same basic protections under the Fourteenth

8

Amendment's due process clause. Accordingly, we apply the same legal standards to deliberate indifference claims brought under either the Eighth or Fourteenth Amendment."). That is no longer the case.

Following the Supreme Court's decision in *Kingsley v. Hendrickson*, the Seventh Circuit has concluded that the standard under the Fourteenth Amendment governing the failure to provide medical or other care for a pretrial detainee is "objective reasonableness." *Miranda v. County of Lake*, 900 F.3d 335, 352–54 (7th Cir. 2018). Under that standard, as recently clarified by the court in *Pittman v. Madison County*, 108 F.4th 561, 566 (7th Cir. 2024), once a pretrial detainee proves that the defendant officer's failure to act was purposeful and intentional, the sole question is an objective one: did the defendant "take reasonable available measures to abate the risk of serious harm?" *Pittman*, 108 F.4th at 572. As the court emphasized, "[t]he objective reasonableness of a decision to deny medical care . . . does not consider the defendant's subjective views about risk of harm and necessity of treatment. Instead, the proper inquiry turns on whether a reasonable officer in the defendant's shoes would have recognized that the plaintiff was seriously ill or injured and thus needed medical care." *Id.* at 570.

This standard is significantly different than the standard that applies in the Eighth Amendment context. Dr. Ronquillo-Horton argues that, because Plaintiffs alleged only an Eighth Amendment violation in the amended complaint, they waived any claim under the Fourteenth Amendment. She has not cited any authority supporting that proposition, however, and the Court is not aware of any. As a matter of law, the authority is to the contrary. "Plaintiffs need only plead facts, not legal theories, in their complaints." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014); *see also R3 Composites Corp. v. G&S Sales Corp.*, 960 F.3d 935, 941 (7th Cir. 2020) ("That is a perfectly viable theory under contract law, and G&S did not

9

Case 1:22-cv-00569-WCG    Filed 09/05/24    Page 9 of 16    Document 132

need to amend its complaint to pursue that theory."). Because this case survives under either standard, it is not necessary for the Court to decide at this time which standard applies. That is an issue the parties should be prepared to more fully address before trial.

**B. Merits**

To survive summary judgment under the Fourteenth Amendment standard, a plaintiff must provide evidence from which a reasonable jury could conclude that: (1) the defendant acted purposefully, knowingly or perhaps recklessly, without regard to her subjective awareness of the risk of inaction, and (2) that the defendant's response to the medical condition was objectively unreasonable. *Pittman*, 108 F.4th at 570–572. With respect to the first prong, it seems likely that in most cases, it will be easily met.

In *Kingsley*, which involved an excessive force claim, the Supreme Court drew a distinction between two state-of-mind questions that now correspond to the two elements that have been fashioned into the two-pronged test for a Fourteenth Amendment failure to act claim:

> We consider a legally requisite state of mind. In a case like this one, there are, in a sense, two separate state-of-mind questions. The first concerns the defendant's state of mind with respect to his physical acts—i.e., his state of mind with respect to the bringing about of certain physical consequences in the world. The second question concerns the defendant's state of mind with respect to whether his use of force was "excessive." Here, as to the first question, there is no dispute. As to the second, whether to interpret the defendant's physical acts in the world as involving force that was "excessive," there is a dispute. We conclude with respect to that question that the relevant standard is objective not subjective. Thus, the defendant's state of mind is not a matter that a plaintiff is required to prove.

576 U.S. at 395.

As for the required state of mind attending the physical acts (the first prong), the Court held that "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind." *Id.* at 396. "That is because," the Court explained, "'liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.'" *Id.* (quoting *County of*

10

Case 1:22-cv-00569-WCG  Filed 09/05/24  Page 10 of 16  Document 132

*Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). The Court then provided examples of situations where the required state of mind would and would not be present in the kind of excessive force case before it: "Thus, if an officer's Taser goes off by accident or if an officer unintentionally trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim. But if the use of force is deliberate—i.e., purposeful or knowing—the pretrial detainee's claim may proceed." *Id.*

In *Miranda*, which applied *Kingsley*'s analysis to claims involving a failure to act, the court provided examples of situations in which the required state of mind for the first prong would not be met in a Fourteenth Amendment claim. After observing that "[a] properly instructed jury could find in that case that [the medical defendants] made the decision to continue observing [the plaintiff] in the jail, rather than transporting her to the hospital, with purposeful, knowing, or reckless disregard of the consequences," the court stated that "[i]t would be a different matter if, for example, the medical defendants had forgotten that [the plaintiff] was in the jail, or mixed up her chart with that of another detainee, or if [a medical defendant] forgot to take over coverage for [another medical defendant] when he went on vacation." 900 F.3d at 354. "Such negligence," the court explained, "would be insufficient to support liability under the Fourteenth Amendment, even though it might support state-law liability." *Id.* In light of these examples, it would appear that the first prong of the test will usually be met since the failure to act is always a knowing or purposeful choice in the absence of the kind of negligence or mistake described by the court in *Miranda*.

With respect to the second prong, *Pittman* has now made clear that, once a pretrial detainee proves that the defendant officer's failure to act was purposeful and intentional, the sole question is an objective one: did the defendant "take reasonable available measures to abate the risk of

11

serious harm?" 108 F.4th at 572.  As the court emphasized, "[t]he objective reasonableness of a decision to deny medical care … does not consider the defendant's subjective views about risk of harm and necessity of treatment. Instead, the proper inquiry turns on whether a reasonable officer in the defendant's shoes would have recognized that the plaintiff was seriously ill or injured and thus needed medical care."

To what extent this standard differs from common law negligence is difficult to discern. *See, e.g., Dakter v. Cavallino*, 2015 WI 67, ¶ 41. 363 Wis.2d 738, 866 N.W.2d 65 (noting that for a claim of negligence, "the standard of ordinary care is an objective standard; it is the care that would be exercised by a reasonable actor under the circumstances").  Yet, the Court has repeatedly cautioned that negligence is not enough. *Kingsley*, 576 U.S. at 396, *Lewis*, 523 U.S. at 849; and *Daniels v. Williams*, 474 U.S. 327, 328 (1986).  But what more is required?  Though this Court expresses some confusion as to how the objective reasonableness standard differs from ordinary negligence, that is the standard the Court is required to apply for Fourteenth Amendment failure to act claims.

The test for Eighth Amendment claims for deliberate indifference in failing to provide medical care is significantly more stringent.  To prevail on an Eighth Amendment claim for failure to provide medical care, the plaintiff must prove: "1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).  The second element is subjective.  The plaintiff must prove that the defendant "actually knew of and disregarded a substantial risk of harm. *Petties v. Carter*, 836 F.3d 722, 728 (7th 2016).

Plaintiffs' clearly meet the standard for showing a Fourteenth Amendment violation.  For purposes of summary judgment, there is no dispute here that Barbuto was suffering an objectively

12

serious medical condition when he was at the Manitowoc County Jail in June 2019. Dkt. No. 115 at 17. There is also no dispute that Dr. Ronguillo-Horton acted knowingly and purposefully in not sending Barbuto to the ER, and a factual dispute exists over whether Dr. Ronguillo-Horton ordered retesting of Barbuto's lithium level for June 28, 2019. Dr. Ronguillo-Horton testified she ordered it but no order was placed, thereby raising a factual dispute as to whether it was ordered.

As for the objective reasonableness of Dr. Ronguillo-Horton's treatment and failure to immediately order Barbuto taken to the ER on June 27, 2019, Plaintiff has offered evidence in the form of an expert opinion from Dr. Landess, a board-certified forensic psychiatrist, that clearly meets his burden to prevent summary judgment. Dr. Landess has rendered the opinion that Dr. Ronquillo-Horton's failure to immediately send Barbuto to the hospital after learning that his lithium levels were in the toxic range at 4.3 mmol/L on June 27, 2019, "represented such a departure from accepted professional judgment, practice, and standards that it demonstrates that Dr. Ronquillo did not base her decision on accepted professional judgment, practice or standards, or on an individualized assessment of Mr. Barbuto." Dkt. No. 111-1 at 1. Dr. Landess offers the same opinion with respect to Dr. Ronquillo-Horton's decision to prescribe Mr. Barbuto indomethacin for five days starting on June 21, 2019, without closely monitoring his lithium levels, which Dr. Landess opines was a cause of Mr. Barbuto's lithium toxicity. *Id.* There is evidence that the delay in sending Barbuto to the hospital worsened his symptoms and caused unnecessary pain and suffering. He continues to suffer neurological and gastrointestinal symptoms that were the result of his lithium toxicity that continued to go untreated, though it is less clear on this record that those symptoms are attributable to Dr. Ronquillo-Horton.

To be sure, Dr. Ronquillo-Horton has offered explanations in support of her contention that her care was reasonable. Dr. Ronquillo-Horton claims that she used her medical judgment and

13

therefore acted reasonably when she reviewed his discharge summary; re-ordered lithium prescribed by mental health staff to address his urges to self-harm; prescribed indomethacin for his gout; and ordered discontinuation of the lithium prescription when his labs showed levels at 4.3 mmol/L. She explains that indomethacin is appropriate treatment for gout symptoms and one elevated lithium test result, without other "clinical findings" of lithium toxicity, would not be enough to send a patient to the ER. She states that Barbuto's vitals were normal, so there were no clinical findings of lithium toxicity consistent with lab results. And she states that she believed his symptoms of nausea, vomiting, and tremors were caused by other medical conditions he had (not lithium toxicity).

Dr. Landess, on the other hand, explains that any doctor using their medical judgment would have known that a prescription for indomethacin can increase lithium levels in certain patients by up to 100%, so Barbuto's lithium levels should have been closely monitored immediately after Dr. Ronquillo-Horton decided to prescribe both medications at the same time. Dr. Landess further states that Barbuto's lithium level of 4.3 mmol/L was in the "severely moderate to severe toxic" range and almost four times the normal amount of 0.5 mmol/L and 1.2 mmol/L. She states that his lab results from June 27 required immediate transportation to the ER in light of his documented symptoms earlier in the week of confusion, nausea, vomiting, and tremors (all of which are early signs of lithium toxicity). Waiting until June 28 to get the ER involved significantly increased the likelihood of death from lithium toxicity.

Dr. Landess also states that Dr. Ronquillo-Horton's use of vitals to make the assessment of his "clinical presentation"—rather than looking at the actual symptoms of lithium toxicity that were already documented in his medical file—fell woefully below the standard of care. Toward

that end, Dr. Landess states that assessment of his vitals was wholly irrelevant to screen for lithium toxicity when objective lab results were available.

If a jury were to accept Dr. Landess' testimony, it could reasonably find in Plaintiffs' favor. Her expert opinion is certainly enough to create a factual dispute that is material to the case. It thus follows, because there are genuine disputes of material fact regarding the reasonableness of Dr. Ronquillo-Horton's medical care, the Court must deny the motion for partial summary judgment to the extent that the Fourteenth Amendment applies.

The Court reaches the same conclusion under the Eighth Amendment standard of deliberate indifference. Dr. Ronquillo-Horton contends Dr. Landess' testimony is merely a disagreement with the use of her medical judgment, which is not enough to avoid summary judgment in a deliberate indifference case. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (noting that disagreement among doctors does not amount to deliberate indifference when a doctor has used their medical judgment). But Dr. Landess offered more than a difference of opinion. Her opinion is that Dr. Ronquillo-Horton's treatment of Barbuto "represented such a departure from accepted professional judgment, practice, and standards that it demonstrates that Dr. Ronquillo did not base her decision on accepted professional judgment, practice or standards, or on an individualized assessment of Mr. Barbuto." Dkt. No. 111-1 at 1. If she did not base her decision on accepted medical judgment, practice or standards, or an individualized assessment of the patient, then what did she base it on?

If Dr. Landess' opinion is believed by the jury, this evidence would support the inference that, contrary to her own testimony, Dr. Ronquillo-Horton was deliberately indifferent to Barbuto's serious medical needs. Based on Dr. Landess' explanation of the interaction between indomethacin and lithium, the signs and symptoms of lithium toxicity, and the lithium levels at

15

which hemodialysis is immediately required for an individual with an altered mental status, the Court cannot discount Dr. Landess' opinion as pure conjecture. From this evidence, a jury could conclude that Dr. Ronquillo-Horton did not use any medical judgment at all while treating Barbuto at the Manitowoc County Jail in June 2019. In other words, a jury could find that she was deliberately indifferent to Barbuto's serious medical needs. This is enough to require that Dr. Ronquillo-Horton's motion be denied.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's partial motion for summary judgment (Dkt. No. 106) is **DENIED**.

Dated at Green Bay, Wisconsin this <u>5th</u> day of September, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge